**G & C CONSTRUCTION CORP.,**
**Appellant,**

v.

**ST. PAUL FIRE AND MARINE**
**INSURANCE CO., Appellee.**

**No. 83–1348.**

United States Court of Appeals,
Fourth Circuit.

Argued Jan. 12, 1984.

Decided March 27, 1984.

John F. Mardula, Vienna, Va. (Eric J. Rossum, Lewis, Mitchell & Moore, Vienna, Va., on brief), for appellant.

Thomas J. Cawley, Fairfax, Va. (Henry A. Schutz, III, McCandlish, Lillard, Rust & Church, Fairfax, Va., F. Joseph Nealon, Steptoe & Johnson, Chartered, Washington, D.C., on brief), for appellee.

Before RUSSELL and WIDENER, Circuit Judges, and HAYNSWORTH, Senior Circuit Judge.

DONALD RUSSELL, Circuit Judge:

This is a diversity breach of contract action by G & C Construction Co., a Virginia corporation (hereafter G & C) against St. Paul Fire & Marine Insurance Co., a Minnesota corporation (hereafter St. Paul), for punitive as well as actual damages. G & C claimed bad faith denial of its contractual rights as the basis for punitive damages. St. Paul refused recovery for losses suffered by G & C as a result of diversion of labor and materials from a construction site at which G & C was the general contractor. At the conclusion of a jury trial of G & C's case, the district court directed a verdict for the defendant on the bad faith claim, and at the close of St. Paul's case the court granted St. Paul's motion for a directed verdict denying G & C's claims for coverage under both insurance policies in question here. G & C has appealed both directed verdicts. We affirm both directed verdicts, although our grounds for doing so differ from those of the district court.

## I

In 1978, G & C, a general contracting company, obtained the bid for construction work renovating an apartment building in the District of Columbia, the Arthur Capper Senior Citizens' Project (hereafter Capper). In early 1979, G & C purchased insurance coverage for its work at Capper under two policies issued by St. Paul—a Comprehensive Dishonesty, Disappearance, and Destruction policy, and a Builder's Risk/Installation policy.

Mavis Contracting Corporation was a mechanical subcontractor with whom G & C often worked. Mavis is not a minority company, and District of Columbia law required that at least half of the work at Capper be done by minority firms. However, G & C is a minority firm, and all G & C employees are "minority employees" for the purpose of the affirmative action law. Hence on February 15, 1979, G & C and Mavis Corp. signed a Construction Management Agreement (the Agreement) under which John Mavis, Mavis Corp.'s owner, was to direct the mechanical subcontracting, primarily plumbing, work at Capper. Under the Agreement, John Mavis was treated as an independent contractor. He was to recommend for hire by G & C such supervisory personnel and laborers as he needed in order to accomplish the mechanical subcontracting. Eventually, two supervisors and two laborers were hired by G & C and counted as minority workers under District of Columbia law. The Agreement specified that John Mavis would not claim employee status or benefits, but for the personnel hired by G & C at Mavis' request, G & C paid wages, insurance, and worker's compensation. John Mavis and

his supervisors had the right under the Agreement to control and requisition all needed materials, subject to G & C approval of purchases over $100.

Following rumors of diversion of Capper materials to another Mavis project, the Brightwood Post Office, G & C began in late 1980 to investigate apparent loss of labor and materials at Capper. Investigation indicated that both materials and labor had been diverted from Capper. G & C consequently notified St. Paul of the loss in March 1981, and in April filed a Proof of Claim. St. Paul denied liability.

In the course of G & C's investigation, it became apparent, and Mavis has conceded, that Mavis himself or the Mavis supervisors at Capper did divert $2,460 in Capper material and $5,143 in Capper labor to Brightwood. Mavis offered G & C $10,000 to settle the dispute, an offer which G & C refused. Both of G & C's insurance policies contained clauses requiring the insured to avoid taking action which might prejudice the insurer's subrogation rights.[1]

## II

■ The first issue on appeal was whether the district court was correct to direct a verdict in favor of St. Paul on the question of whether St. Paul denied G & C's claim in bad faith. G & C alleged tortious bad faith as a separate offense in addition to breach of contract because a separate offense is necessary for an award of punitive damages. We find no merit at all in G & C's characterization of the undisputed facts as evidence of bad faith, and accordingly affirm on the bad faith claim for the reasons stated by the district court.

## III

■ The second issue presented is whether it was proper to direct a verdict that G & C was not entitled to recover under either policy. To recover, G & C would have had to show that it suffered a loss and then prove that one of the policies covered the loss shown. We assume without deciding that a loss was shown when Mavis offered a $10,000 settlement for the $7,603 in labor and materials it acknowledged had been diverted from Capper. However, we conclude that neither policy covered this loss, and so, somewhat reluctantly, we agree with the district court's conclusion that G & C is not entitled to recover from St. Paul the amount conceded by Mavis to have been misappropriated.

The liability of St. Paul, if any, rests on the two policies issued by it to G & C. In determining whether St. Paul is liable, it is necessary to analyze the insuring clauses of the two policies.

The Risk Policy issued by St. Paul describes the property covered as "buildings, structures, and installations, including labor costs, and any and all materials ... *to be used in or incidental to the construction*, fabrication ... or completion *of the property as described* in the Schedule [emphasis added]." Clause 7, however, in an "entrustment exception," states that the policy does *not* insure against "Misappropriation, secretion, conversion, infidelity, or any dishonest act on the part of the insured or other party of interest, his or their employees or agents or others to whom the property may be delivered or entrusted."

It is obvious from these clauses that the Risk Policy would cover the loss of materials due to the dishonesty of both Mavis and his supervisors, were it not for the "entrustment" exceptions. The Agreement between Mavis and G & C clearly gave Mavis and the personnel he recommended for hire by G & C control of all material to be used in the mechanical subcontracting work at Capper. Hence the material diverted from Capper was not covered by the Risk Policy.

---

**1.** G & C's right to recover against Mavis is not before this court. However, it was litigated in the United States District Court for the District of Columbia, *G & C Construction Corp. v. Mavis,* No. 83–1261, and disposed of by a Memorandum and Order filed 30 January 1984. The calculation of damages, at issue in our suit, is also the subject of a suit in the Superior Court of the District of Columbia, *G & C Construction Corp. v. Government of the District of Columbia,* Civil Action No. 14,491–83 filed 9 December 1983.

Moreover, the Risk Policy does not, in our view, cover the labor diverted from Capper at all. The policy merely covers property, and *labor costs incidental to construction of buildings and installations.* The labor diverted from Capper was not incidental to any installation insured by the Risk Policy. Plumbers at Capper were simply transferred to the Brightwood site to work, so that the "labor costs" diverted from Capper were the plumbers' wages. The cost of labor unassociated with a building does not come under the provisions of the Risk Policy.

## IV

 The Dishonesty Policy issued by St. Paul covers "Loss of money, securities and other property ... through any fraudulent or dishonest act or acts committed by any of the employees, acting alone or in collusion with others." The word "property" is not defined, but "employee" is defined as "any natural person ... while in the regular service of the insured in the ordinary course of the insured's business and whom ... the insured has the right to govern and direct, but does not mean any broker, factor, ... contractor, or other agent or representative of the same general character."

The Dishonesty Policy does not cover misappropriations by John Mavis himself, an independent contractor, because the language of the policy specifically excludes "contractors ... or other agents or representatives of the same general character," as well as making it clear that only those whom the insured has the right to govern and direct may be covered. Likewise, it does not cover thefts of material by the Mavis supervisors and plumbers on the G & C payroll, because these people were not under the guidance and direction of G & C, but of Mavis. We note that G & C's having gone to the trouble and expense of hiring John Mavis is evidence that G & C itself was incapable of directing the mechanical subcontracting work.

■ The policy does not cover the misappropriated labor, in any event, because absent a definition of "property" specifically

including manpower, we cannot consider the wages or laborers to be property. This is especially true, where, as here, the context of the policy language makes it clear that such tangible property as money and securities were contemplated.

For these reasons, we affirm the holding of the district court denying G & C recovery against St. Paul under either policy.

AFFIRMED.